IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

      v.                                                      21-CR-106-WMS

SPENCER HART,

                        Defendant.

---

## GOVERNMENT RESPONSE TO
## DEFENDANT'S SENTENCING MEMORANDUM

**THE UNITED STATES OF AMERICA**, through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Maeve E. Huggins, Assistant United States Attorney, of counsel, hereby files its Response to Defendant's Sentencing Memorandum (Doc. 77). For reasons which follow, the government respectfully requests that the Court sentence the defendant to a term of imprisonment within the <u>guidelines range of 168 to 210 months</u> to appropriately account for the 18 U.S.C. § 3553 factors.

This memorandum addresses the defendant's sentencing submissions, including a letter relating to a psychological evaluation completed by Dr. Michael E. Rutter, and therefore, limited sealing is appropriate. *See United States v. Roeder*, No. 05-CR-6161L, 2009 WL 385448, at *2 (W.D.N.Y. Feb. 13, 2009) (sealing confidential reports from the defendant's psychotherapist and psychiatrist to prevent public disclosure of private medical and psychological information).

I.   **THE SENTENCING RANGES FOR OFFENSES INVOLVING THE EXPLOITATION OF CHILDREN ARE THE PRODUCT OF CAREFUL ANALYSIS BY CONGRESS AND THE U.S. SENTENCING COMMISSION**

In his sentencing memorandum, the defendant criticizes the evolution of the § 2G2.2 sentencing guideline applicable to the defendant, and urges this Court not to give deference to the guidelines. *See* Doc. 77 at 2-3. In making this assertion, the defendant neglects to consider the full history behind the 1991, 1996, 2003, and 2004 amendments to § 2G2.2. The history of those amendments demonstrates that § 2G2.2 is the product, not only of the Commission's institutional expertise, but also of thoughtful Congressional oversight. While a full accounting here of the legislative history would be overly voluminous, the following details drawn from the legislative history exemplify Congress' and the Commission's exercise of their proper institutional roles during those periods. In particular, the history reflects Congress' study of the sources and harms of child pornography, as well as the Commission's involvement.

In initially formulating § 2G2.2, the Commission reviewed past sentencing practices as set forth in § 1A1.1(3). After the statutorily mandated 180-day period of review, the original sentencing guidelines became effective November 1, 1987. Later, in response to the Commission's proposed 1991 revisions to the child pornography guidelines, including § 2G2.2, Congress enacted its first directive to the Commission, but before rejecting the Commission's proposed revisions, the Senate and the House considered extensive data and testimony.[1] 137 Cong. Rec. S10322-04; 137 Cong. Rec. H6736-02. That Congressional

---

[1] This data and testimony included the 1986 Report of the U.S. Congress Permanent Subcommittee on Investigations on Child Pornography and Pedophilia, testimony and submissions from the National Coalition Against Pornography, the National Law Center for Children and Families, the National Coalition for Children's Justice, the National Obscenity Enforcement Unit, Department of Justice attorneys and staff, Southern

action clearly was informed by thorough factual research. Furthermore, the staff of the House of Representatives conducted a point-by-point response to concerns voiced by the Commission, which was included in the House legislative records. 137 Cong. Rec. H6736-02 at 6739-40. That exchange highlights how the different institutional perspectives of Congress and the Commission guided the development of § 2G2.2. Ultimately, in accordance with its authority under 28 U.S.C. § 994(p) to "modif[y]" a proposed amendment, Congress approved an amendment to the Treasury Postal Service Appropriations Bill of 1991, which directed the Commission to make certain revisions in § 2G2.2, as well as other guidelines. That amendment was approved by the Senate and House, and enacted in Section 632 of Pub.L. 102-141. Treasury, Postal Service and General Government Appropriations Act of 1992, Pub.L. 102-141, 1991 HR 2622. Interestingly, in Section 632(1)(C), Congress amended the guidelines to address the amount of child pornography in a defendant's possession: "Pursuant to its authority under section 994 of Title 28, United States Code, the Sentencing Commission shall promulgate guidelines, or amend existing or proposed guidelines as follows: . . . Guideline § 2G2.4 [shall] ... provide at least a 2 level increase for possessing 10 or more books, magazines, periodicals, films, video tapes or other items containing a visual depiction involving the sexual exploitation of a minor." *Id*.

---

California Child Exploitation Task Force, Exploited and Missing Children Unit, the Badgley Report from 1984 (linking child molestation with juvenile and adult prostitution), the Surgeon General's Workshop on Pornography, Morality in the Media, the Religious Alliance Against Pornography, and academics and writers such as Ann Burgess (a professor at the University of Pennsylvania with a federal grant to study child pornography), David Duncan (a professor at Southern Illinois University), Judith Reisman (studying pseudo child pornography), David A. Scott (author of In Pornography; A Human Tragedy), and Don Feder (from the Boston Herald), all of which were adopted into the record.

Changes in 1996 to § 2G2.2 and the guidelines relating to child pornography likewise reflected a process of thoughtful Congressional analysis and proper institutional cooperation.[2] For example, in 1995 the House Judiciary Committee Report found that computer

---

[2] In 1996, when increasing punishment for child pornography offenses, Congress made the following findings as to the reasons for H.R. 1240:

SUBSECTION 1. FINDINGS.

Congress finds that-

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer; ...

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come ...

(10)(A)the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT of 1997, PL 104 208, 110 Stat 3009, Section 121 (September 30, 1996).

4

transmission of child pornography presented a significant threat to children: "Distributing child pornography through computers is particularly harmful because it can reach an almost limitless audience." H.R. Rep. 104-90 at 3. Congress also "found that as the use of computers and the use of electronic communications increase . . . it has, unfortunately, also increased for criminal use, including the sale of pornographic materials . . . of children." 141 Cong. Rec. H4122-01 at H4123. *See also*, 141 Cong. Rec. S5509-02.[3] As a result, Congress sought not only to toughen penalties for child pornography and child exploitation, "two of the most horrendous and repulsive crimes that can possible exist . . . [that] can ruin a young person's life virtually at the time it has begun," but also to address the impact of the rise of Internet usage on these crimes. 141 Cong. Rec. H4122-01 at H4123. It, therefore, enacted the Sex Crimes Against Children Prevention Act of 1995 ("SCACPA"). Pub. L. 104-71, 1995 HR 1240, 109 Stat. 774. In SCACPA, Congress directed the Commission to increase the base offense level for offenses under 18 U.S.C. §§ 2251 and 2252 by at least two levels and

---

3 During the debate in the Senate, Senator Grassley specifically spoke about the need to make penalties for various violations of child pornography statutes stronger with the use of computer:
> H.R. 1240 seeks to enhance prison time as well as fines for child pornographers who use computers to trade in child pornography. I believe that this penalty enhancement is an important measure and the Grassley Hatch Thurmond amendment merely clarifies what the House intended to do in order to remove any possible confusion in the future.
> Computers are now the preferred business forum for child pornographers. Due to modern technology, predatory pedophiles sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct.
> Simply put, child pornography on computers is dangerous and must be stopped. In the past, whenever State or Federal law enforcement agents arrested a child pornographer, or ring of child pornographers, they seized and then destroyed the child pornography. This kept child pornography out of the hands of child molesters and preserved the privacy of the children who had been so callously exploited. *But now, because of digital computer technology, it is nearly impossible to actually destroy child pornography. That means there will be more child pornography for child molesters and less privacy for abused children*. We in Congress must do something.
> H.R. 1240 and the Grassley Hatch Thurmond amendment would discourage child pornographers from using computers to trade in child pornography. And when the U.S. Sentencing Commission reports to us this fall on how computer child pornographers are being punished, I will take a close look to see if there is anything the Senate can do to provide even more protection to children.

141 Cong. Rec. S5509-02. (emphasis added).

to increase the base offense level by at least two levels for offenses committed under 18 U.S.C. § 2251(c)(1)(A) or §§ 2252(a)(1)-(3) when a computer was used to "transmit the notice of" or "transport or ship" the images. *Id*. Effective November 1, 1996, the Commission amended § 2G2.2 to "implement[] the congressional directives" in SCACPA, as well as to address variations in courts' application of the enhancement for a "pattern of activity involving sexual abuse." *U.S. Sentencing Guideline Manual*, App. C, Amendment 537 (1996).

Notably, SCACPA also required the Commission to "submit a report to Congress concerning offenses involving child pornography and other sex offenses against children" within 180 days. Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 1995 HR 1240, 109 Stat. 774. SCACPA specifically asked the Commission to consider modifications of guidelines relating to child pornography offenses, and to conduct "a survey of recidivism rate for offenders convicted of committing sexual crimes against children, an analysis of the impact on recidivism of sexual abuse treatment provided during or after incarceration or both, and an analysis of whether increased penalties would reduce recidivism for these crimes." *Id*. The Commission conducted this review and presented its report in June 1996. That review further demonstrates the Commission's analytical contribution to the formation of the guidelines for child pornography sentencing. *Id*.

Congress then passed the Prosecutorial Remedies and Tools against the Exploitation of Children Today Act ("the PROTECT Act") in 2003. Pub.L. 108-21, 2003 S 151. In formulating the PROTECT Act, the Judiciary Committee heard extensive testimony that

addressed child pornography issues and the technological changes in its production and dissemination.  S. Rep. 108-002.[4]

In 2004, the Commission substantially amended the child pornography sentencing guidelines to include the Congressionally mandated enhancements, including the number of images enhancement, as well as to ensure that, in light of the PROTECT Act, these sections continued to assign proportional punishment to possession, receipt, transportation, and distribution of child pornography.  Pub.L. 108-21, 2003 S 151, at 671.  For example, the Commission decided to consolidate § 2G2.4 and § 2G2.2 of the guidelines, explaining that

> Consolidation addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline (§ 2G2.2 or § 2G2.4) for cases involving convictions of 18 U.S.C. § 2252 or § 2252A.  Furthermore, as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics.

*U.S. Sentencing Guidelines Manual*, App. C, Amendment 664 (2004).  The Commission also increased the base level offense for possession of child pornography to 18, something that also was not a Congressional directive.  *Id*.  The Commission apparently considered one of the directives, a change to the number of images enhancement, to be a wise change because it created Application Note 4 to § 2G2.2, which provides two possible grounds for an upward departure: "if the number of images substantially under represents the number of minors or if

---

[4] The Judiciary Committee heard testimony from Daniel P. Collins, Associate Deputy Attorney General and Chief Privacy Officer, United States Department of Justice; Frederick Schauer, Professor of Law, John F. Kennedy School of Government, Harvard University; Anne M. Coughlin, Professor of Law, University of Virginia School of Law; and Daniel S. Armagh, Director, Legal Resources Division, National Center for Missing and Exploited Children.  At that time, the Committee also considered the evidence and testimony presented on June 4, 1996, during the hearing on the Child Pornography Prevention Act of 1996, detailing the problems of child pornography and the technological changes in the production and dissemination of these materials.

the length of the videotape or recording is substantially more than five minutes." *U.S. Sentencing Guidelines Manual*, App. C, Amendment 664 (2004). The Commission further included in Application Note 4, that video clips should be counted as a minimum of 75 images. *Id*. Thus, not only did the 2004 revisions to § 2G2.2 result from thorough Congressional study, but the revisions once more underscored that the guidelines concerning child pornography offenses were shaped by more than unfettered political force.

Since 2004, Congress has continued to monitor the evolution of child pornography offenses, particularly given the continuing expansion of the Internet and evolving technological issues that shape the production and dissemination of child pornography. The information it has reviewed reinforces its identification of the Internet as the new frontier in the trading, viewing, and receiving of images of child pornography. For instance, in 2006, the House Committee on Energy and Commerce held nine days of hearings addressing child pornography, child safety, and the Internet. In January 2007, that Committee received a bipartisan staff report on the Sexual Exploitation of Children over the Internet. The report makes several findings, including that:

   (i)   The sexual exploitation of children over the Internet is increasing due to the ease with which pedophiles and child predators can trade, sell, view, and download images of child porn over the internet;
   (ii)  The number of sexually exploitative images of children over the Internet is increasing, the victims are becoming younger, and the substance of the images is growing more violent;
   (iii) Commercial web sites are growing, and that this is likely to be a multi-billion dollar-a-year industry;
   (iv)  The use of digital photography and web cameras, the ability to communicate anonymously over the internet, the use of electronic payments, the limited retention of Internet Protocol ("IP") data linked to a subscriber; and the unclear reporting requirements for social networking web sites and web hosting companies all limit enforcement of existing laws and enable the spread of child pornography.

Sexual Exploitation of Children Over the Internet, January 2007. Indeed, data tracked by the National Center for Missing and Exploited Children ("NCMEC") verifies that, far from diminishing, the number of images of children in circulation on the Internet has been growing exponentially since NCMEC began its Child Victim Identification Program in 2002, pursuant to 42 U.S.C. § 5773. Since 2002, law enforcement agencies have been required to provide seized images to NCMEC for analysis. In addition to this analysis, NCMEC is charged with assisting law enforcement in locating and rescuing child victims who have not yet been identified. In 2002, when the program began, NCMEC analyzed 8,643 images or videos each week. Currently, NCMEC analyzes an average of 143,000 seized images and videos each week. Moreover, the total number of identified victims and identified series continues to grow, from 95 identified victims and 73 identified series in 2002 to 1247 identified victims and 832 identified series in 2007.

The full legislative history clearly demonstrates that Congress and the Commission have, in their respective institutional capacities, devoted extensive resources to the development of child pornography penalties. Congress has sought out and reviewed testimony of victims, offenders, law enforcement officers, prosecutors, and First Amendment scholars, as well as numerous empirical studies, addressing the harms caused by child pornography and the penalties necessary to eradicate it. Based on this information, Congress has several times enacted laws manifesting its evolving understanding of the harms of child pornography and the effectiveness of criminal sanctions. The Commission has, in turn, committed extensive resources to gathering data on sentencing practices for Congress and to identifying guidelines that rationalize and remove disparities in sentencing practices, while

conforming to Congressional directives. The following chart summarizes the contributions of Congress and the Commission to the formation of § 2G2.2:

**Distribution/Receipt of Child Pornography:**

| Base Offense Level | 13 | Commission 1987 |
|---|---|---|
| Base Offense Level | 15 | Congress 1991 |
| Base Offense Level | 17 | Congress 1996 |
| Base Offense Level | 20/22 | Commission, to comport with Congressional mandatory minimum, 2004 |

**Possession of Child Pornography:**

| Base Offense Level | 10 | Commission 1991 |
|---|---|---|
| Base Offense Level | 13 | Congress 1991 |
| Base Offense Level | 15 | Congress 1996 |
| Base Offense Level | 18 | Commission, to comport with Congressional mandatory minimum, 2004 |

**Specific Enhancements:**

| Distribution for pecuniary gain | Commission 1987 |
|---|---|
| Distribution for thing of value | Congress 2000 |
| Distribution to a minor | Commission 2000 |
| Distribution to persuade minor to engage in sexual conduct | Commission 2000 |
| Image of a prepubescent minor or minor under 12 | Commission 1987, 1988 |
| Sadistic/masochistic images | Commission 1990 |
| Pattern of Abuse | Congress 1991 |
| Use of computer | Congress 1996 |
| Number of images | Congress, 1991, 2003 |

1987 U.S. Sentencing Guideline Manual; U.S. Sentencing Guideline Manual, App. C, Amendments 31, 325, 435, 436, 537, 592, 649, 664 (1998-2004); Treasury, Postal Service and General Government Appropriations Act of 1992, Pub.L. 102-141, 1991 HR 2622; Sex

Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 1995 HR 1240, 109 Stat. 774; Protection of Children from Sexual Predators Act of 1998, Pub.L. 105-314; The PROTECT Act of 2003, Pub.L. 108-21, 2003 S 151.

In summary, the defendant's argument that the child pornography guidelines should be ignored is meritless.  Through research, analysis, and public hearings, Congress and the U.S. Sentencing Commission carefully analyzed the problem of sexual exploitation of children, and cooperatively developed the present day § 2G2.2.  It is true that Congress occasionally has utilized its authority to set criminal penalties by directing the Commission to add or modify an enhancement, but such a directive is an appropriate exercise of Congressional authority.  Since the guidelines were originally enacted, Congress has become far more educated about these crimes through the examination of studies and research that have reflected the previously unknown information, including the seriousness of these pornography crimes; the ongoing, significant, detrimental effect on children when their images are continually propagated online; and the significant likelihood that child pornographers are often engaging in contact offenses, something that cannot be known until the offender has completed a significant amount of sex offender treatment conducted by an experienced provider.  With this knowledge, Congress has repeatedly increased the statutory penalties for these crimes and has worked with the Sentencing Commission to develop appropriate sentencing guidelines.  Although the history behind the development of the sentencing guidelines might not be equivalent to the development of other guidelines, Congress and the Commission have properly formulated the child pornography guidelines.

In *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010), the Second Circuit noted that § 2G2.2 is an "eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." Yet, even in light of the concerns raised in *Dorvee*, as well as *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010), a sentence within the guidelines range of 168 to 210 months, which is below the statutory maximum, is appropriate.

In *Dorvee*, the Second Circuit held that the defendant's sentence was procedurally and substantively unreasonable, in part, based on the district court's unsupported finding that the defendant was likely to sexually assault a child. *Dorvee*, 616 F.3d at 183. Here, there are various troubling aspects of this case, and characteristics possessed by the defendant, that bear on the defendant's risk of recidivism.

Also, of issue to the panel in *Dorvee* was the district court's failure to justify "why the maximum available sentence, as opposed to some lower sentence, was required to deter an offender like Dorvee." *Id*. at 184. In *Tutty*, the Second Circuit held that the "district court committed procedural error when it concluded that it could not consider a broad, policy based challenge to the child pornography Guidelines." *Tutty*, 612 F.3d at 131. *Dorvee*, and cases following, instruct that a district court "may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors." *Dorvee*, 616 F.3d at 182. Here, the government has set forth the relevant information to sentencing in this action, and based on that information, submits that a sentence within the guidelines range of 168 to 210 months is appropriate.

12

## II. THE DEFENDANT MIMINIZES THE NATURE AND CIRCUMSTANCES OF HIS OFFENSE THAT JUSTIFY A GUIDELINE SENTENCE

This defendant characterizes his criminal conduct as commonplace in the arena of child exploitation and minimize his persistent sexual interest in children and lack of impulse control by requesting this Court sentence him below the guidelines range and at the statutory minimum of 120 months imprisonment (Doc. 77 at 2, 4). He excuses what he terms a "run-of-the-mill child pornography offense" (Doc. 77 at 3) as a product of his "very traumatic childhood" (Doc. 77 at 5). Such argument ignores the heinous nature of child pornography — the permanent memorialization of child sexual victimization — and this defendant's persistent role in viewing and distributing such. Instead, this Court should sentence this defendant, based upon the 18 U.S.C. § 3553 factors, as the man that he truly is: a man with a dangerous sexual interest in children and who is now stands convicted of multiple child pornography crimes.

## III. THE DEFENDANT'S ARGUMENTS REGARDING REOFFENDING AND HIS EVALUATION ARE NOT A RELIABLE MEASURE OF WHETHER HE WILL REOFFEND

The defendant's compliance while on pre-trial release, notwithstanding difficult circumstances, should play no role in sentencing. His compliance was not exceptional, but rather, conforming his behavior to what the Court directed and expected. It does not reflect any attrition for his criminal behavior or reflect any true rehabilitation.

[redacted]



Moreover, without a guideline sentence, the goals of specific and general deterrence will not be accomplished. *See* 18 U.S.C. §§3553(a)(2)(B) and 3553(a)(2)(C). The defendant is persistent in his criminal behavior. For his first child pornography offense, he received a sentence of 180 days in prison only *after* he violated the terms of his probation resulting in it being revoked and him resentenced (Doc. 72 ¶72). This sentence clearly did not deter him from ultimately engaging in further criminal behavior. Approximately three months later, law enforcement detected that the defendant returned to the distribution and possession of child pornography. *Id*. ¶¶ 26-32. The investigation of which ultimately led to this conviction. *Id*. ¶ 33. The defendant's own words and conduct demonstrate an individual unable to conform his behavior to the law. The only true deterrence for this defendant can be achieved through the imposition of a guidelines sentence.

## **CONCLUSION**

For all of the reasons stated in the government's sentencing memorandum (Doc. 64) and the above, this Court should impose a sentence that reflects the disturbing nature of the offense, the defendant's persistent behavior, and the need to deter him and others like him. Accordingly, the government respectfully requests that the Court sentence the defendant within the applicable guidelines range of 168 to 210 months.

DATED:   Buffalo, New York, May 24, 2023.

TRINI E. ROSS
United States Attorney

BY:   s/ MAEVE E. HUGGINS
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5872
Maeve.Huggins@usdoj.gov